Anna **ROUSEY**, Individually and as Administratrix for the Estates of Palmer Lee Rousey and Fred Marion Alsman, Plaintiff–Appellant,

v.

**UNITED STATES of America,** Defendant–Appellee.

No. 96–5360.

United States Court of Appeals, Sixth Circuit.

Submitted March 20, 1997.

Decided June 9, 1997.

ON BRIEF: C. David Emerson, Emerson & Bayer, Lexington, KY, for Appellant. Thomas Lee Gentry, Office of the U.S. Attorney, Lexington, KY, for Appellee.

Before: KENNEDY, KRUPANSKY, and NORRIS, Circuit Judges.

## OPINION

KRUPANSKY, Circuit Judge.

The plaintiff-appellant, Anna Rousey, individually and as administratrix of the estates of Palmer Lee Rousey and Fred Marion Alsman, has challenged the district court's summary dismissal of her complaint against the United States for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, anchored in her physical injuries, and in the murders of her decedents, committed by Robert Dagineau ("Dagineau"), a recently released former resident of a Department of Veterans' Affairs ("DVA") psychiatric hospital. The plaintiff charged negligence by DVA mental health professionals in the treatment and release of Dagineau, and in the failure of the institution to warn appropriate persons of possible dangers posed by Dagineau's discharge.

On September 20, 1991, Dagineau, a veteran of military service in the Vietnam conflict, voluntarily enrolled in a 28 day post traumatic stress disorder ("PTSD") treatment program at a DVA medical facility located in Togus, Maine ("VAMF–Togus"). His medical records revealed that, at the time of his admission to the hospital, the patient suffered from a variety of physical and psychological maladies, including depression, bouts of anger or rage, sleep disturbance, episodic alcohol dependency, and stress resulting from marital difficulties. However, he suffered from no delusions or hallucinations, and denied any plan to harm others or himself. His medical files, and the affidavits of DVA employees, further disclosed that, during his stay at the medical center, he displayed moods swings and uncontrolled emotional outbursts, including throwing or kicking objects, but never exhibited violence towards any person and never made any threat to

seriously injure any person in the presence of any hospital staff member.

On October 17, 1991, hospital personnel instructed Dagineau that the following day, October 18, 1991, was the final day of his voluntary enrollment in the PTSD treatment program at VAMF–Togus. Prior to the time of his discharge, VAMF–Togus instructed Dagineau that upon concluding the 28 day treatment he had two options for the continuance of voluntary treatment which it could arrange for him to pursue—he could either (1) enter an in-residence "observation unit" at the hospital, or (2) continue therapy as an outpatient. Dagineau elected to pursue outpatient treatment at a DVA health center situated in Kentucky, his home state. He departed VAMF–Togus on October 18, 1991, the final day of his voluntary commitment to the 28 day PTSD program.

Preceding his release from VAMF–Togus, DVA psychiatrists diagnosed Dagineau as mentally competent. Because he was not deemed mentally ill, Dagineau could not have been involuntarily committed to a mental institution.[1] Although Dagineau's medical progress notes for October 17, 1991 (the day preceding his discharge) memorialized his doctor's observations that "there is some concern that he may harm others[,]" they further related that "[h]e is not psychotic, understands that it is wrong to threaten or harm others, and in my view this pattern of anger, threats, and violence to objects is longstanding [and] not likely to benefit from control in DV[A], or specific medication approach there. He does not have a plan to hurt anyone." J.A. at 81.

Following his departure from VAMF–Togus, Dagineau returned to Kentucky. On November 9, 1991, in Harrodsburg, Kentucky, Dagineau assaulted an automobile with a hail of handgun fire. Tragically, the assailant's volley killed four of the six occupants of that vehicle (his estranged wife Donna Dagineau, Fred Alsman, Palmer Lee Rousey, and Thomas Bannister); and wounded the remaining two passengers (the plaintiff Anna Rousey and Rita McGlone). Dagineau then used the weapon to take his own life.

On April 11, 1995, the plaintiff sued the United States government[2] for negligence damages. On February 13, 1996, the district court dismissed the plaintiff's case via summary judgment for the defendant. *Rousey v. United States*, 921 F.Supp. 1550 (E.D.Ky. 1996).

■ Congress has mandated that the United States shall be liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. In the tort case *sub judice*, the law of Maine (the situs of the alleged negligence) controls the plaintiff's substantive claims. 28 U.S.C. § 1346(b); *see Rayonier Inc. v. United States*, 352 U.S. 315, 319, 77 S.Ct. 374, 376–77, 1 L.Ed.2d 354 (1957). The existence of a duty of care running from the defendant to the plaintiff presents a question of law disposable on summary judgment. *Sellers v. United States*, 870 F.2d 1098, 1102 (6th Cir.1989) (per curiam); *Joy v. Eastern Maine Medical Center*, 529 A.2d 1364, 1365 (Me.1987).

1. Maine law defines a "mentally ill person" as:

> a person having a psychiatric or other disease which substantially impairs his mental health, including persons suffering from the effects of the use of drugs, narcotics, hallucinogens or intoxicants, including alcohol, but not including mentally retarded or sociopathic persons. ME.REV.STAT. ANN., tit. 34–B, § 3801(5) (West 1996).
> Maine law creates an emergency procedure whereby any person may apply for the judicially ordered involuntary hospitalization of a mentally ill person. ME.REV.STAT. ANN., tit. 34–B, § 3863 (West 1996). That application must be accompanied by a certification executed by a licensed

physician or clinical psychologist which states that he examined the subject on a date certain not more than three days prior to the date of hospital admission and that "[h]e is of the opinion that the person is mentally ill and, because of his illness, poses a likelihood of serious harm." ME.REV.STAT. ANN., tit. 34–B, § 3863(2) (West 1996). The plaintiff has not contested the defendants' expert psychiatric proof which evidenced that Dagineau was not "mentally ill" under section 3801(5) and hence was not subject to judicially compelled involuntary detention in a psychiatric facility.

2. The plaintiff initiated an amended complaint on May 12, 1995.

■ Initially, the plaintiff has contended that the VAMF–Togus psychiatrists who treated Dagineau violated a legal duty of care owed to her and her decedents by negligently *discharging* Dagineau from the facility, which action directly and proximately caused the subject deaths and injuries. Although the scope of a psychiatrist's or a psychiatric institution's duty of care (if any) to third persons for the negligent release of a patient has not been directly judicially defined in Maine, federal courts may, nonetheless, consult pertinent or analogous legal principles, policies, precedents, and doctrinal trends embraced by its appellate courts, *see Janikowski v. Bendix Corp.*, 823 F.2d 945, 950 (6th Cir.1987), as well as other "relevant data," *Garden City Osteopathic Hospital v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995), to predict a state court's disposition of a given controversy. "Relevant data" may include "the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the 'majority' rule[.]" *American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 158 (6th Cir.1997) (*quoting Grantham and Mann v. American Safety Prods., Inc.*, 831 F.2d 596, 608 (6th Cir.1987)).

Decisions of the Maine Supreme Judicial Court analogous to the instant cause have promoted a public policy favoring insulation of psychiatrists from liability for failure to diagnose a patient to be seriously dangerous as a result of mental illness and hence legally subject to involuntary commitment. In *Taylor v. Herst*, 537 A.2d 1163 (Me.1988), the Maine Court dictated that, in Maine Tort Claims Act cases, a psychiatrist enjoys official "discretionary function" immunity from liability for alleged negligence in determining that a patient is not subject to involuntary commitment under Maine law, even if that psychiatrist is not a state employee, because, in rendering a decision respecting the legal fitness of a patient for involuntary commitment, said physician is acting as a state officer.[3] The *Taylor* Court commented:

> Undoubtedly, in enacting the provisions of the [Maine] Tort Claims Act, the Legislature had in mind that "[i]t is in the public

interest that physicians should be reasonably protected in undertaking the duties imposed upon them by [psychiatric commitment laws]." *Sukeforth v. Thegen*, 256 A.2d 162, 164 (Me.1969). Without protection from civil liability, physicians would be discouraged from examining persons for involuntary commitment, thereby making the process unworkable. As we recognized in *Darling*, "[i]f release decisions were exposed to the threat of liability those individuals charged with rendering those decisions would likely become unduly responsive to one consideration—the cost of liability."

*Taylor*, 537 A.2d at 1165–66 (*quoting Darling v. Augusta Mental Health Institute*, 535 A.2d 421, 429 (Me.1987)). In *Darling*, a case which *inter alia* applied discretionary function immunity to protect a state-employed psychiatrist from liability for an allegedly negligent decision to terminate a patient's involuntary commitment, 535 A.2d at 427–28, the Maine Court further pronounced:

> Moreover, the threat of liability would undermine a statewide policy favoring open door treatment rather than custodial detention of the state's mentally ill.

*Darling*, 535 A.2d at 429.

■ Although the United States has represented that it does not advance any discretionary immunity defense in the case at bench, *Rousey*, 921 F.Supp. at 1552, the public policies and reasoning underlying the decisions rendered by the Maine Supreme Judicial Court in *Taylor* and *Darling* militate to support the conclusion that the Maine Court, if directly confronted with resolution of the scope of a psychiatric hospital's potential liability to a third party for damages incurred because of the allegedly negligent release of a voluntarily admitted mental patient, would rule that a mental hospital or mental health professional can be liable to third parties for injuries caused by the negligent release of a voluntarily admitted mental patient only when, at the time of his release, that patient satisfied state law requirements for forcible commitment. *See Sellers v. United States,*

---

**3.** *See also Clark v. Maine Medical Center*, 559 A.2d 358, 360 (Me.1989) (following *Taylor*).

870 F.2d 1098, 1104–05 (6th Cir.1989) (per curiam).

This rule prevails because the defendant can incur a legal *duty* to control a person only when the defendant possesses (or at least can obtain) the legal *power* to control that individual. This rule is supported by the RESTATEMENT (SECOND) OF TORTS (1965). Section 315 postulates:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> > (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> >
> > (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Section 319 of the RESTATEMENT (SECOND) OF TORTS pronounces:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Comment a, illustration 2 to section 319 states:

> A operates a private sanitarium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and causes harm to C. A is subject to liability to C.

■ Patently, no "special relation" arising from state law existed between Dagineau and VAMF–Togus doctors, or between VAMF–Togus doctors and the plaintiff or her decedents, which could impose upon the defendant any duty to detain the patient, or to otherwise control his conduct, because VAMF–Togus possessed neither court-or-dered custody of Dagineau nor statutory authority to obtain physical control over him.

The plaintiff's argument that the alleged *expulsion* of Dagineau from the treatment center against his wishes removes the instant case from the embrace of the general rule is unavailing because Dagineau was *not* expelled from VAMF–Togus. The admissible, relevant evidence of record disclosed that, at the close of Dagineau's voluntary participation in the 28 day PTSD program, VAMF–Togus offered Dagineau the further treatment options of either (1) voluntarily entering a residential "observation unit" at that facility or (2) pursuing out-patient counseling.[4] Dagineau elected to receive out-patient therapy at a DVA facility located in his home state. VAMF–Togus arranged out-patient treatment for Dagineau at the DVA mental health center in Lexington, Kentucky, solely to accommodate his preference.

Next, the plaintiff has claimed that VAMF–Togus is liable to her and her decedent's estates for negligently *treating* Dagineau during his residency at that facility. Rousey has charged that, during the course of Dagineau's participation in the voluntary 28 day PTSD program, VAMF–Togus negligently *failed to improve* Dagineau's mental state to a level which rendered him fit and safe to return to society (and, by necessary implication, failed to *predict* that Dagineau would commit homicides and deadly assaults), *not* that the treatment provided to Dagineau *affirmatively* caused him to kill or injure others. *See Sellers,* 870 F.2d at 1103.

■ A review of the Maine Supreme Judicial Court's decisions indicate that it would adhere to the rule that any violation of a duty of care by a psychiatrist to adequately treat a patient's mental affliction can, at most, engender liability only to the patient himself or to specific other persons or classes of persons whom the psychiatrist has reason

---

**4.** The only "evidence" proffered by the plaintiff to prove that VAMF–Togus evicted Dagineau against his will was an affidavit executed by Herbert Clegg, a former mental patient at the hospital. Clegg asserted that he overheard Dagineau inform hospital staff members that he desired placement in a hospital observation unit rather than discharge from the facility. However, Dagineau's alleged statements related by Clegg are inadmissible hearsay. FED.R.EVID. 801(c), 802.

Moreover, uncontradicted and unimpeached hospital records proved beyond contradiction that Clegg was not in residence at VAMF–Togus during the time that he purportedly heard Dagineau make the alleged statements. *See* further discussion in note 5, *infra.*

to know are at special risk of violent injury at the hands of the patient. Unlike the negligent failure to diagnose, cure, or treat a communicable disease, or to advise a patient that he or she should avoid driving while undergoing certain debilitating therapy (which pose serious known, direct, and foreseeable risks to the safety of the general public), the mere failure to predict that a psychiatric patient may pose a threat of violence to the populace at large or to some unknown individual(s) cannot create a duty of care to unknown and unidentifiable individuals, given the inherent difficulty of accurately predicting any volitional human behavior. *Sellers,* 870 F.2d at 1103 ("The science of psychiatry is relatively inexact as compared with the physical sciences. The behavior of psychiatric patients ... is much more difficult to predict, and thus to foresee, than the behavior and reactions of patients who are treated for purely physical conditions.") Recognizing the Maine Supreme Judicial Court's policy pronouncements in *Taylor* and *Darling* that expansive liability of psychiatrists to third parties is socially undesirable, it would appear that the Maine Supreme Judicial Court clearly would not adopt a rule of general liability to unforeseeable and unidentifiable victims of a psychiatric patient's violence. All admissible, relevant evidence of record reflected that Dagineau never stated to any person at the VAMF–Togus any intention to kill, shoot, or otherwise injure anyone at any time.[5]

Nonetheless, the plaintiff contends that VAMF–Togus medical personnel should have foreseen that, given Dagineau's anger and hostility ignited by his pending divorce, he posed a risk of violence towards persons physically proximate to his wife. However, once again, no record evidence disclosed any stated intention or objective indicia by Dagi-

neau to kill or injure persons near his wife, and no psychiatrist could have reasonably predicted that Dagineau would kill or injure a group of people who happened to be accompanied by Mrs. Dagineau during a social evening. Accordingly, the plaintiff cannot advance any claim anchored in alleged inadequacies in the care given to Dagineau while enrolled in the voluntary PTSD program because, on the record herein, the plaintiff cannot prove that the members of Dagineau's treatment team could have reasonably foreseen that Dagineau posed a special risk to the plaintiff or her decedents, or even to a general class of persons characterized by physical proximity to Dagineau's estranged wife.

 Finally, the plaintiff asserts that VAMF–Togus owed a *duty to warn* Dagineau's wife, or the local police in her home town, about alleged potential dangers posed by Dagineau's release from the institution. However, VAMF–Togus had no duty to warn anyone because its psychiatrists had reasonably determined that Dagineau posed no immediate or direct threat to anyone. Moreover, even if Dagineau had been deemed potentially dangerous at the time of his discharge, VAMF–Togus could owe no duty of care towards the plaintiff and her decedents because they were not reasonably foreseeable and readily identifiable potential victims of violence by Dagineau. *Rousey,* 921 F.Supp. at 1559. A psychiatrist can have a duty to warn "only when specific threats are made against specific victims." *Cairl v. Minnesota,* 323 N.W.2d 20, 26 (Minn.1982). *See also Peck v. Counseling Serv.,* 146 Vt. 61, 499 A.2d 422, 426 (1985); *McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500, 511–12 (1979) (ruling that the duty to warn extends only to readily identifiable potential victims).

---

5. The Clegg affidavit (*see* note 4 *supra*) alleged that Dagineau had stated verbal threats to kill his wife in the presence of VAMF–Togus personnel. However, hospital records proved that Clegg was not a patient at VAMF–Togus at the time that these alleged threats were made. Incompetent or otherwise inadmissible evidence cannot defeat a summary judgment motion. *See* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2727 (2d ed.1983); 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.14[4] (2d ed.1976). Clegg's affi-

davit was patently untrustworthy, uncorroborated, and unworthy of belief, and thus would be properly subject to exclusion from evidence at trial as incompetent, irrelevant, a waste of time, misleading, confusing, or prejudicial. FED. R.EVID. 401–403; *United States v. Vincent,* 681 F.2d 462, 465 (6th Cir.1982). In any event, the threats allegedly made by Dagineau are immaterial to the case *sub judice* because none were directed against the plaintiff or either of her decedents.

A psychiatrist owes no duty to the general public to warn of the release of a potentially dangerous patient, in part because the issuance of warnings to the public at large upon the discharge of every patient possessed of general latent violent tendencies would be futile given the sheer volume of such warnings which would be continuously published.[6] *See Sellers,* 870 F.2d at 1102–04; *Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 76–77, 614 P.2d 728, 734–35 (1980).

Accordingly, the judgment of the district court is hereby **AFFIRMED.**

---

**6.** For this reason, the plaintiff's invocation of ME.REV.STAT. ANN. tit. 22, § 822 (West 1996), which requires physicians to notify the state public health department of persons infected with a communicable disease, is misconceived. As developed above, contagious disease carriers present a direct, proximate, foreseeable, definite, and immediate menace to every member of the public who attains contact with the infected individual; whereas the threat posed to any particular member of the general public by a psychologically troubled individual who simply harbors potentially aggressive impulses is entirely speculative, remote, and contingent upon unknowable variables.